JUDGE PAULEY          10 CV          749

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SYNCORA GUARANTEE INC.,                    :    10-CV-
                                           :
            Plaintiff,                      :    **COMPLAINT**
                                           :
        -against-                          :
                                           :
EMC MORTGAGE CORPORATION,                  :
                                           :
            Defendant.                      x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RECEIVED
FEB - 1 2010
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Syncora Guarantee Inc., ("SGI") formerly known as XL Capital Assurance Inc., by and through its attorneys, Venable LLP, for its Complaint against the defendant, EMC Mortgage Corporation ("EMC"), hereby alleges as follows:

### NATURE OF THE ACTION

1.      This is a breach of contract action made necessary by defendant EMC's refusal to provide SGI with access to certain mortgage loan and financial information in contravention of the explicit terms of a July 31, 2007 Insurance and Indemnity Agreement ("I&I Agreement") between SGI and, among others, EMC. (A copy of the I&I Agreement is attached hereto as Exhibit A). In this action, SGI seeks access to the mortgage loan and financial information, as well as associated costs and attorneys' fees.

2.      The I&I Agreement was entered into in connection with the issuance of a financial guarantee insurance policy (the "Policy") insuring the Class A-1 Notes issued in connection with a re-securitization, or Re-REMIC, of certain collateralized mortgage obligations

that had been originated, structured and sold by EMC and its affiliate, The Bear Stearns Companies Inc. ("Bear Stearns").  In the I&I Agreement, EMC, among other things:

(a) made and/or reaffirmed numerous representations and warranties, including those concerning key attributes of the mortgage loans that underlay the re-securitized obligations, as well as the underwriting guidelines and procedures of the entities that issued and funded these loans (I&I Agreement Sections 2.01(l) and (n));

(b) agreed to provide SGI with the right to inspect the mortgage loan files and other financial information underlying the re-securitized obligations at least annually, and upon the happening of certain events, including, among other things, a ratings downgrade of the underlying  obligations (I&I Agreement Sections 2.02(c) and (d));

(c) agreed to reimburse and indemnify SGI for any and all losses caused by breaches of these representations and warranties (I&I Agreement Sections 3.04(a) and (b)); and

(d) agreed to reimburse SGI for expenses incurred in connection with enforcing and preserving its rights under the I&I Agreement (I&I Agreement Sections 2.02(d) and 3.03(c)).

3.      On the basis of the promises made by EMC and others in the I&I Agreement, SGI issued the Policy on or about July 31, 2007.  Not long after the Policy was issued, in August and December of 2007, the underlying obligations were downgraded as it became evident that the mortgages making-up these underlying obligations were defaulting.  The underlying obligations were downgraded again in October and November 2008.

4.      As a result of the performance failures and consequent writedowns on the underlying mortgages, the underlying securities were written down, causing the Class A-1 Notes

to be written down. As such, SGI has paid claims of approximately $21,286,778 under the Policy and incurred numerous other additional expenses.  Consequently, as expressly stipulated in the I&I Agreement, SGI has made repeated demands to EMC to provide SGI with access to the mortgage loan files, and other financial information, underlying the re-securitized transactions. In breach of the I&I Agreement, EMC has refused to provide or otherwise make available this information.  This action for specific performance and contractual expenses, including attorneys' fees, follows:

## PARTIES

5.    SGI (previously known as XL Capital Assurance Inc.)  formally changed its name to Syncora Guarantee Inc., on August 4, 2008.  SGI is a New York corporation with its principal place of business in New York, New York.  SGI is a New York licensed insurer which was previously engaged in the business of writing financial guarantee insurance.

6.    Defendant EMC is organized under the laws of the State of Delaware and its principal place of business is 2780 Lake Vista Drive, Lewisville, Texas 75067.  EMC was at all relevant times herein an affiliate of Bear Stearns.  EMC regularly transacts business in New York and in this District.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this proceeding, pursuant to 28 U.S.C. § 1332(a), because this action is between parties who are citizens of different states and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.    EMC has expressly consented to the jurisdiction of this Court over this action, pursuant to Section 6.05(a) of the I&I Agreement.

9.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to the claim occurred in this District and

because EMC has expressly consented to venue in this District, pursuant to Section 6.05(a) of the I&I Agreement.

## FACTUAL BACKGROUND

### The Insurance and Indemnity Agreement

10.    In 2006 and 2007, EMC and Bear Stearns were in the business of, among other things, originating, servicing, selling and securitizing residential mortgage loans.

11.    Between August and December 2006, Bear Stearns created the following four trusts: Bear Stearns Mortgage Funding Trust 2006-SL2, Bear Stearns Mortgage Funding Trust 2006-SL3, Bear Stearns Mortgage Funding Trust 2006-SL5, and Bear Stearns Mortgage Funding Trust 2006-SL6, each of which had a "Pooling and Servicing Agreement." These pooling and servicing agreements were among EMC as seller and master servicer, Bear Stearns Asset Backed Securities I LLC as depositor and La Salle National Bank Association as trustee. Pursuant to the documentation establishing each of these trusts and the terms of the respective pooling and servicing agreements, Class A and I-A certificates were issued (the "Underlying Certificates"). The Underlying Certificates represent an ownership interest in the above-referenced trusts which each consist primarily of a pool of fixed-rate, conventional, closed-end, Alt-A and subprime mortgage loans that are secured by junior liens on residential properties (collectively, the "Underlying Mortgage Loans"). (I&I Agreement, Recitals and Section 1.01.) All of the transactions referred to in this paragraph are, at times, described collectively as the "Underlying Transactions". The Underlying Certificates received ratings of AAA by Standard & Poor's ("S&P") and Aaa by Moody's Investor Service, Inc. ("Moody's").

12.    The Underlying Transactions contain collateral originated by Bear Stearns Residential Mortgage Corporation ("BSRMC") (20-25%) and collateral purchased by EMC from various originators through its conduit channels (75-80%). Performance of the obligations

reflected in the Underlying Transactions was generally poor and certain classes of bonds issued as part of the Underlying Transactions were put on negative watch by S&P.

13.     On or about July 31, 2007, Bear Stearns and CMO Holdings III Ltd ("CMO III"), a Cayman Islands corporation, entered into an Asset Sale Agreement ("Asset Sale Agreement"). Pursuant to this Asset Sale Agreement, Bear Stearns agreed to sell the Underlying Certificates to CMO III.  CMO III, in turn, agreed to issue the Bear Stearns Structured Products Inc. Trust Series 2007-R5 notes (the "2007 Transaction"), representing equity in CMO III.    (I&I Agreement, Recitals).   The 2007 Transaction is a re-securitization of Real Estate Mortgage Investment Conduits, or a "Re-REMIC," consisting of a re-securitization of previously issued mortgage backed securities which in turn consisted of fixed pools of mortgages.  The Class A-1 Notes of the 2007 Transaction ("Class A-1 Notes") consisted of the highest rated, most secure bonds from the Underlying Transactions.  They were the most senior of securities issued in the 2007 Transaction and benefitted from the subordination of the Class A-2 Notes of the 2007 Transaction and any subordination embedded in the Underlying Certificates.

14.     On or about July 31, 2007, SGI entered into the I&I Agreement with EMC, Bear Stearns, CMO III, The Bank of New York (London Office) ("BONY-London") and the Bank of New York ("BONY").  Pursuant to the I&I Agreement, SGI agreed to act as the insurer for the Class A-1 Notes, guaranteeing certain payments with respect to the Class A-1 Notes.  EMC was to act as the Underlying Master Servicer, Bear Stearns as the Seller, CMO III as the Issuer, BONY-London as the Fiscal Agent and BONY as the Collateral Agent.  (I&I Agreement, Recitals.)

15.    In the I&I Agreement, EMC also made certain representations and warranties concerning the Underlying Mortgage Loans and the Underlying Certificates, including, in Section 2.01(l), that:

> [n]either the Operative Documents nor other material information relating to the Underlying Certificates, the Underlying Mortgage Loans, . . . furnished to the Insurer [SGI] in writing or in electronic form by EMC, the Seller or the Issuer contains any statement of a material fact which was untrue or misleading in any material respect when made.

In addition, in Section 2.01(n) of the I&I Agreement, EMC represented and warranted that:

> [e]ach of the representations and warranties of EMC, the Seller and the Issuer contained in the applicable Operative Documents is true and correct in all material respects . . . .

The Operative Documents include the I&I Agreement, the Asset Sale Agreement, and the underlying pooling and servicing agreements (discussed in paragraph 11 above) within which EMC, as seller and Servicer, made detailed representations and warranties regarding both the origination and documentation of the mortgage loans specific to those agreements.    (I&I Agreement, Section 1.01.)

16.    In reliance on and in consideration for the representations, warranties and other obligations undertaken by EMC and others in the I&I Agreement,  SGI issued the Policy in favor of the Fiscal Agent BONY-London, for the benefit of the holders of the Insured Notes.[1]  (A copy of the Policy is attached hereto as Exhibit B.)  As more particularly stated in the Policy, the Policy covers timely payments of interest, certain Deficiency Amount payments, and ultimate payment of principal, in each case subject to certain customary exceptions and exclusions.  The face amount outstanding of the Class A-1 Notes was $157,789,853 as of the issuance date and was $71,933,873 as of December 29, 2009.

---

[1]    Capitalized terms not defined in this Complaint have the meanings set forth in the I&I Agreement and/or the Policy.

17.    To date, SGI has paid $21,286,778 as a result of claims made under the Policy for payments due to holders of the Class A-1 Notes as a result of losses on the underlying mortgage loans.

**B.    SGI's Rights to Access Mortgage Documentation and Financial Information**

18.    In addition to the representations and warranties discussed above, the I&I Agreement provides that EMC, as Servicer, and Bear Stearns, as Seller, have the contractual obligation to provide SGI with financial information and access to documents concerning the Underlying Mortgage Loans.    Specifically, Section 2.02 of the I&I Agreement provides, in pertinent part:

> *Affirmative Covenants of EMC, the Seller and the Issuer*.    Each of EMC, the Seller and the Issuer, with respect to itself only and not as any other, hereby agrees that …
>
> ***
>
> *(d)    Access to Records; Discussions with Officers and Accountants.* **Once in each calendar year, or at any time following any withdrawal, reduction or qualification of any rating assigned to any of the Underlying Certificates (a "Ratings Event"),** following the occurrence of any Default or Event of Default that has not been waived or cured, at any time following the occurrence of a Trigger Event, or, with respect to EMC, an Event of Servicer Termination has occurred **the Seller and EMC shall, upon the reasonable request of the Insurer, permit the Insurer** or its authorized agents:
>
>> (i) **to inspect the books and records of the Seller and EMC as they may relate to the Underlying Mortgage Loans or Underlying Certificates, the Notes, the obligations of the Seller or EMC under the Operative Documents to which it is a party and the Transaction;**
>>
>> (ii) to discuss the affairs, finances and accounts of the Seller and EMC as they relate to the Underlying Mortgage Loans or Underlying Certificates, the Transaction or the Seller's or EMC's ability to perform its respective obligations under the Operative Documents with an officer of the Seller or EMC, as applicable;

\* \* \*

Notwithstanding the foregoing, the Insurer shall have the right, so long as any of the Notes remains outstanding, to conduct an ongoing review of EMC's practices as a servicer and master servicer **through reviews of the Underlying Mortgage Loans**, reappraisals of mortgaged properties related to such Underlying Mortgage Loans and reviews of Servicing Practices.

All of the inspections, discussions and due diligence referred to in this Section 2.02(d) shall be at the expense of the Insurer; *provided however,* that **any such undertaking following a Ratings Event**, a Trigger Event or the occurrence of a Default, Event of Default or Event of Servicer Termination that remains uncured and unwaived, **shall be at the expense of EMC.**

(Italics in original, emphasis in bold supplied.)

19.    In addition to SGI's annual right of inspection and its right to conduct an ongoing review of EMC's practices through a review of the Underlying Mortgage Loans, a "Ratings Event," as defined in Section 2.02(d) of the I&I Agreement, has occurred due to a reduction of the rating assigned to the Underlying Certificates.  The first such reduction occurred in August 2007, when Moody's downgraded the 2006-SL3, 2006-SL5 and 2006-SL6 Underlying Certificates from Aaa to Aa2 and the 2006-SL2 Underlying Certificate from Aaa to Aa1. Standard & Poors quickly followed suit in December 2007, downgrading all of the Underlying Certificates from AAA to B.  Subsequently, in October of 2008, Moody's downgraded all of the Underlying Certificates to Ca, and in November 2008, Standard & Poors downgraded the Underlying Certificates to D.  For all of these reasons, pursuant to Section 2.02(d) of the I&I Agreement, SGI is entitled to inspect the information set forth in paragraph 18 hereof (hereinafter collectively referenced to as the "Mortgage Information"), at the expense of EMC.

20.    SGI has performed its obligations pursuant to the I&I Agreement.

21.    SGI has made numerous demands to EMC for access to the Mortgage Information, and although already subject to a legally binding confidentiality agreement, has even agreed to enter into another appropriate confidentiality agreement to safeguard considerations of borrower privacy.    EMC, however, has refused to comply with SGI's contractual demands for inspection.

22.    EMC has also failed to fulfill its ongoing obligation to produce financial statements, accountants' reports and other information pursuant to Section 2.02(c).    This obligation requires that EMC (i) produce the annual audited consolidated statement of financial condition of each of EMC, the Seller and their respective subsidiaries within 120 days of the close of each fiscal year; (ii) quarterly financial statements upon the occurrence of a material adverse change; (iii) annually updated data tapes containing underlying mortgage data; and (iv) other information, including schedules, financial statements or other similar reports delivered to EMC pursuant to the terms of the Operative Documents as defined under the I&I Agreement.    To date, EMC has failed to produce any of the above in violation of Section 2.02 (c) of the I&I Agreement.

## CLAIM I

### (Specific Performance)

23.    SGI restates and incorporates paragraphs 1 through 22 above as if set forth fully herein.

24.    By virtue of, among other things, its annual right of inspection, its right to conduct an ongoing review of EMC's practices as well as the Ratings Event, triggered by the rapid and repeated downgrading of the Underlying Certificates, and in accordance with Section

2.02(d) of the I&I Agreement, SGI has made repeated, reasonable written and oral requests to EMC to permit access to the Mortgage Information in order for SGI to examine whether the representations and warranties made by EMC, and others, concerning the Underlying Transactions and the 2007 Transaction were true.

25.    Despite SGI's requests, EMC has failed and refused to provide SGI with the Mortgage Information or allow SGI access to the Mortgage Information.  EMC's refusal is without justification.  EMC has given SGI access to substantially similar mortgage information, as contractually required, in another transaction, and upon information and belief, other similarly situated financial-guarantee insurers have also been permitted to access similar underlying mortgage information to protect their rights under similar agreements.

26.    As a result of EMC's refusal, SGI has been denied important contractual rights pursuant to the I&I Agreement and cannot determine the extent to which EMC and others may have breached any representations and warranties contained in the I&I Agreement and/or the Operative Documents thereto, relating to material information regarding the Underlying Certificates and/or the Underlying Mortgage Loans (see I&I Agreement, Section 2.01(1)).

27.    SGI lacks an adequate remedy at law.

28.    Accordingly, by virtue of EMC's breach of the I&I Agreement, SGI is entitled to specific performance of Section 2.02 (d) of the I&I Agreement.

## CLAIM II

### (Specific Performance)

29.    SGI restates and incorporates paragraphs 1 through 28 above as if set forth fully herein.

30.    EMC has failed to provide SGI with the financial statements, accountants' reports and other information required under Section 2.02(c) of the I&I Agreement.    EMC's non-compliance is without justification.

31.    As a result of EMC's refusal, SGI has been denied important contractual rights pursuant to the I&I Agreement and cannot determine the extent to which EMC and others may have breached any representations and warranties contained in the I&I Agreement and/or the Operative Documents thereto, relating to material information regarding the Underlying Certificates and/or the Underlying Mortgage Loans (see I&I Agreement, Section 2.01(1)).

32.    SGI lacks an adequate remedy at law.

33.    Accordingly, by virtue of EMC's breach of the I&I Agreement, SGI is entitled to specific performance of Section 2.02 (c) of the I&I Agreement.

## CLAIM III

### (Fees)

34.    SGI restates and incorporates paragraphs 1 through 33 above as if set forth fully herein.

35.    By virtue of EMC's breaches of the I&I Agreement set forth above, pursuant to Section 2.02(d) of the I&I Agreement, SGI is entitled to recover from EMC the costs of the inspection.

36.    By virtue of EMC's breaches of the I&I Agreement set forth above, pursuant to Section 3.03(c) of the I&I Agreement, SGI is entitled to recover from EMC the reasonable attorneys' fees and costs incurred by SGI in enforcing or preserving its rights under or relating to the I&I Agreement.

## RELIEF REQUESTED

WHEREFORE, SGI respectfully requests that this Court enter a final judgment in favor of SGI and against EMC as follows:

A.     Ordering EMC to comply with Section 2.02(d) of the I&I Agreement and provide documents concerning the Underlying Mortgage Loans;

B.     Ordering EMC to comply with Section 2.02(c) of the I&I Agreement and provide Financial Statements, Accountants' Reports and Other Information as provided for in the I&I Agreement;

C.     Ordering EMC to pay the cost of any and all inspections and discussions as provided for in Section 2.02(d) of the I&I Agreement;

D.     Awarding SGI its reasonable attorneys' fees and costs in enforcing or preserving its rights under the I&I Agreement, pursuant to Section 3.03(c) of the I&I Agreement; and

E.     Granting to SGI such other and further relief as the Court deems just and proper.

Dated: February 1, 2010
New York, New York

Respectfully submitted,

VENABLE LLP

Edmund M. O'Toole
William H. Devaney
1270 Avenue of the Americas, 25th Floor
New York, New York 10020
Tel.: (212) 307-5500
Fax: (212) 307-5598

*Attorneys for Plaintiff*
SYNCORA GUARANTEE INC.

Exhibit A

XL CAPITAL ASSURANCE INC.,
as Insurer,

EMC MORTGAGE CORPORATION,
as Underlying Master Servicer,

BEAR, STEARNS & CO. INC.,
as Seller

CMO HOLDINGS III LTD.,
as Issuer,

THE BANK OF NEW YORK (LONDON OFFICE),
as Fiscal Agent

AND

THE BANK OF NEW YORK,
as Collateral Agent

# INSURANCE AND INDEMNITY AGREEMENT

CMO HOLDINGS III LTD.,
BEAR STEARNS STRUCTURED PRODUCTS INC. TRUST,
SERIES 2007-R5

CLASS A-1 NOTES

Dated as of July 31, 2007

# TABLE OF CONTENTS

(This Table of Contents is for convenience of reference only and shall not be deemed to be part of this Agreement.  All capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in Article I of this Agreement.)

Page

ARTICLE I DEFINITIONS ..... 2

**Section 1.01.** *Defined Terms.* ..... 2
**Section 1.02.** *Other Definitional Provisions* ..... 6

ARTICLE II REPRESENTATIONS, WARRANTIES AND COVENANTS ..... 6

**Section 2.01.** *Representations and Warranties of EMC, the Seller and the Issuer.* ..... 6
**Section 2.02.** *Affirmative Covenants of EMC, the Seller and the Issuer* ..... 10
**Section 2.03.** *Negative Covenants of the Seller, the Issuer and EMC* ..... 15
**Section 2.04.** *[RESERVED]* ..... 16
**Section 2.05.** *Representations, Warranties and Covenants of the Insurer.* ..... 16

ARTICLE III THE POLICY; REIMBURSEMENT ..... 17

**Section 3.01.** *Issuance of the Policy* ..... 17
**Section 3.02.** *Payment of Fees and Premium.* ..... 18
**Section 3.03.** *Reimbursement Obligation.* ..... 19
**Section 3.04.** *Indemnification.* ..... 20
**Section 3.05.** *Payment Procedure* ..... 23
**Section 3.06.** *[RESERVED].* ..... 23
**Section 3.07.** *Subrogation.* ..... 23
**Section 3.08.** *Deductions..* ..... 24

ARTICLE IV FURTHER AGREEMENTS ..... 24

**Section 4.01.** *Effective Date; Term of the Insurance Agreement* ..... 24
**Section 4.02.** *Further Assurances and Corrective Instruments.* ..... 24
**Section 4.03.** *Obligations Absolute* ..... 25
**Section 4.04.** *Assignments; Reinsurance; Third-Party Rights* ..... 26
**Section 4.05.** *Liability of the Insurer.* ..... 27

ARTICLE V DEFAULTS AND REMEDIES ..... 27

**Section 5.01.** *Defaults.* ..... 27
**Section 5.02.** *Remedies; No Remedy Exclusive.* ..... 28
**Section 5.03.** *Waivers.* ..... 29

ARTICLE VI MISCELLANEOUS ..... 29

**Section 6.01.** *Amendments, Etc.* ..... 29

i

Page

| | | |
|---|---|---|
| **Section 6.02.** | *Notices* | 29 |
| **Section 6.03.** | *Severability.* | 31 |
| **Section 6.04.** | *Governing Law* | 31 |
| **Section 6.05.** | *Consent to Jurisdiction.* | 31 |
| **Section 6.06.** | *Consent of the Insurer* | 32 |
| **Section 6.07.** | *Counterparts.* | 32 |
| **Section 6.08.** | *Headings.* | 32 |
| **Section 6.09.** | *Trial by Jury Waived.* | 32 |
| **Section 6.10.** | *Limited Liability* | 32 |
| **Section 6.11.** | *No Partnership.* | 33 |

INSURANCE AND INDEMNITY AGREEMENT (as may be amended, modified or supplemented from time to time, this "Insurance Agreement"), dated as of July 31, 2007, by and among XL CAPITAL ASSURANCE INC., as Insurer (the "Insurer"), BEAR, STEARNS & CO. INC., as Seller (the "Seller"), EMC MORTGAGE CORPORATION, as Underlying Master Servicer (the "Underlying Master Servicer" or "EMC"), CMO HOLDINGS III LTD., as Issuer (the "Issuer" or the "Trust"), THE BANK OF NEW YORK (LONDON OFFICE), as Fiscal Agent (the "Fiscal Agent") and THE BANK OF NEW YORK as Collateral Agent (the "Collateral Agent").

## RECITALS :

WHEREAS, pursuant to the Bear Stearns Mortgage Funding Trust 2006-SL2, Mortgage Backed Certificates, Series 2006-SL2 Pooling and Servicing Agreement, dated as of August 1, 2006 (the "2006-SL2 Pooling and Servicing Agreement"), the Bear Stearns Mortgage Funding Trust 2006-SL2, Mortgage-Backed Certificates, Series 2006-SL2, Class A Certificates were issued (the "2006-SL2 Class A Certificates");

WHEREAS, pursuant to the Bear Stearns Mortgage Funding Trust 2006-SL3, Mortgage Backed Certificates, Series 2006-SL3 Pooling and Servicing Agreement, dated as of September 1, 2006 (the "2006-SL3 Pooling and Servicing Agreement"), the Bear Stearns Mortgage Funding Trust 2006-SL3, Mortgage-Backed Certificates, Series 2006-SL3, Class A Certificates were issued (the "2006-SL3 Class A Certificates");

WHEREAS, pursuant to the Bear Stearns Mortgage Funding Trust 2006-SL5, Mortgage Backed Certificates, Series 2006-SL5 Pooling and Servicing Agreement, dated as of November 1, 2006 (the "2006-SL5 Pooling and Servicing Agreement"), the Bear Stearns Mortgage Funding Trust 2006-SL5, Mortgage-Backed Certificates, Series 2006-SL5, Class I-A Certificates were issued (the "2006-SL5 Class I-A Certificates");

WHEREAS, pursuant to the Bear Stearns Mortgage Funding Trust 2006-SL6, Mortgage Backed Certificates, Series 2006-SL6 Pooling and Servicing Agreement, dated as of December 1, 2006 (the "2006-SL6 Pooling and Servicing Agreement" and together with the 2006-SL2 Pooling and Servicing Agreement, the 2006-SL3 Pooling and Servicing Agreement and the 2006-SL5 Pooling and Servicing Agreement, the "Underlying Pooling and Servicing Agreements"), the Bear Stearns Mortgage Funding Trust 2006-SL6, Mortgage-Backed Certificates, Series 2006-SL6, Class I-A Certificates were issued (the "2006-SL6 Class I-A Certificates" and together with the 2006-SL2 Class A Certificates, the 2006-SL3 Class A Certificates and the 2006-SL5 Class I-A Certificates, the "Underlying Certificates");

WHEREAS, each Underlying Certificate represents an ownership interest in a trust fund (each, an "Underlying Trust Fund") which consists primarily of a pool (each an "Underlying Mortgage Pool") of fixed rate, conventional, closed-end, Alt-A and subprime mortgage loans that are secured by junior liens on one- to four-family residential properties (collectively, the "Underlying Mortgage Loans");

WHEREAS, the Underlying Pooling and Servicing Agreements provide for, among other things, the master servicing of the Underlying Mortgage Loans by EMC;

WHEREAS, pursuant to the Asset Sale Agreement, dated as of July 31, 2007 (the "Asset Sale Agreement"), between the Seller and the Issuer, the Seller will sell the Underlying Certificates to the Issuer;

WHEREAS, the Deed of Covenant, dated as of July 31, 2007 (the "Deed of Covenant"), of the Issuer and the Fiscal Agency Agreement, dated as of July 31, 2007 (the "Fiscal Agency Agreement"), by and among the Issuer, the Fiscal Agent and the Collateral Agent, provides for, among other things, the issuance of Bear Stearns Structured Products Inc. Trust, Series 2007-R5, Class A-1 Notes and Class A-2 Notes (the "Notes") representing equity in the Issuer;

WHEREAS, pursuant to the Administration Agreement, dated as of June 23, 2006 (the "Administration Agreement"), Maples Finance Limited, as the Administrator (the "Administrator"), will perform certain administrative functions on behalf of the Issuer;

WHEREAS, the Insurer has issued the Policy, pursuant to which it has agreed to pay in favor of the Fiscal Agent on behalf of the Issuer and for the benefit of the Holders of the Insured Notes (as defined herein), certain payments in respect of or related to Underlying Certificates;

WHEREAS, the Insurer shall be paid an upfront Premium, payable on the Closing Date, as set forth herein and in the Premium Letter described herein; and

WHEREAS, each of EMC, the Seller and the Issuer has undertaken certain obligations in consideration for the Insurer's issuance of its Policy.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01.**    *Defined Terms.*    Unless the context clearly requires otherwise, all capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Policy described below or, if not defined therein, in the Fiscal Agency Agreement. For purposes of this Insurance Agreement, the following terms shall have the following meanings:

"2006-SL2 Class A Certificates" has the meaning given such term in the recitals hereof.

"2006-SL3 Class A Certificates" has the meaning given such term in the recitals hereof.

"2006-SL5 Class I-A Certificates" has the meaning given such term in the recitals hereof.

"2006-SL6 Class I-A Certificates" has the meaning given such term in the recitals hereof.

"2006-SL2 Pooling and Servicing Agreement" has the meaning given such term in the recitals hereof.

"2006-SL3 Pooling and Servicing Agreement" has the meaning given such term in the recitals hereof.

"2006-SL5 Pooling and Servicing Agreement" has the meaning given such term in the recitals hereof.

"2006-SL6 Pooling and Servicing Agreement" has the meaning given such term in the recitals hereof.

"Administration Agreement" has the meaning given such term in the recitals hereof.

"Asset Sale Agreement" has the meaning given such term in the recitals hereof.

"Closing Date" means July 31, 2007.

"Commission" means the Securities and Exchange Commission.

"Data Tape" has the meaning assigned to such term in Section 2.02(c)(iii).

"Deed of Covenant" has the meaning given such term in the recitals hereof.

"Default" means any event which results, or which with the giving of notice or the lapse of time or both would result, in an Event of Default.

"Documents" has the meaning given such term in Section 2.01(l).

"EMC" has the meaning given such term in the recitals hereof.

"Event of Default" means any event of default specified in Section 5.01 of this Insurance Agreement.

"Event of Servicer Termination" means any event which results, or which with the giving of notice or the lapse of time or both would result in an Event of Default as such term is defined in the Underlying Pooling and Servicing Agreements.

"Financial Statements" means, with respect to (a) the Seller, (i) its consolidated statements of financial condition as of November 30, 2006, November 30, 2005 and November 30, 2004 and the statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended November 30, 2006 and the notes thereto and (ii) its consolidated statements of financial condition as of May 31, 2007, May 31, 2006 and the three month periods therein and (b) EMC, (i) its consolidated statements of financial condition as of November 30, 2006, November 30, 2005 and November 30, 2004 and the statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended November 30, 2006 and the notes thereto.

"Fiscal Agency Agreement" has the meaning given such term in the recitals hereof.

"Holder" has the meaning given such term in the Policy.

"Indemnification Agreement" means the Indemnification Agreement, dated as of July 31, 2007, between the Insurer and the Initial Purchaser.

"Initial Purchaser" means Bear, Stearns, & Co. Inc.

"Insurance Agreement" has the meaning given such term in the initial paragraph hereof.

"Insured Notes" means Bear Stearns Structured Products Inc. Trust, Series 2007-R5, Class A-1 Notes.

"Insurer" means XL Capital Assurance Inc., or any successor thereto, as issuer of the Policy.

"Insurer Information" has the meaning given such term in Section 3.04(a)(v).

"Investment Company Act" means the Investment Company Act of 1940, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Issuer" has the meaning given such term in the recitals hereof.

"Late Payment Rate" means the lesser of (a) the greater of (i) the prime rate as published in the Wall Street Journal (or if no such rate is published thereby, in a publication selected by the Insurer) (any change in such rate of interest to be effective on the date such change is published) plus 2%, and (ii) the then applicable rate of interest on the Insured Notes and (b) the maximum rate permissible under applicable usury or similar laws limiting interest rates. The Late Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days for any Payment Date.

"Material Adverse Change" means, in respect of any Person, a material adverse change in the ability of such Person to perform its obligations under any of the Operative Documents, including any material adverse change in the business, financial condition, results of operations or properties of such Person on a consolidated basis with its subsidiaries which might have such effect.

"Note Purchase Agreement" means the Note Purchase Agreement, dated as of July 31, 2007, between the Initial Purchaser and the Issuer with respect to the offer and sale of the Notes, as such may be amended, modified or supplemented from time to time.

"Notes" has the meaning given such term in the recitals hereof.

"Offering Document" means the Private Placement Memorandum in respect of the Notes, dated July 31, 2007, and any amendment or supplement thereto, and any other offering document in respect of the Notes prepared by or on behalf of the Issuer that makes reference to the Policy.

"Operative Documents" means this Insurance Agreement, the Indemnification Agreement, the Notes, the Asset Sale Agreement, the Deed of Covenant, the Fiscal Agency Agreement, the Note Purchase Agreement, the Administration Agreement, with respect to EMC

4

only, the Underlying Pooling and Servicing Agreements and each other document contemplated by any of the foregoing to which the Issuer, the Seller, the Fiscal Agent, the Collateral Agent, the Administrator or EMC is a party.

"Person" means an individual, joint stock company, trust, unincorporated association, joint venture, corporation, business or owner trust, partnership, limited liability company or other organization or entity (whether governmental or private).

"Policy" means the Financial Guaranty Insurance Policy No. CA03917A, together with all endorsements thereto, issued by the Insurer in favor of the Fiscal Agent, for the benefit of the Holders.

"Premium" means the upfront premium payable in accordance with this Insurance Agreement, which shall be payable as the "Premium Amount" pursuant to the Premium Letter and payable in accordance with the Fiscal Agency Agreement.

"Premium Letter" means the letter agreement between the Insurer and the Issuer dated the date hereof in respect of the upfront Premium payable in consideration of the issuance of the Policy.

"Securities Act" means the Securities Act of 1933, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Securities Exchange Act" means the Securities Exchange Act of 1934, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Transaction" means the transactions contemplated by the Operative Documents, including the transactions described in the Offering Document.

"Trust Estate" means all of the right, title and interest in and to (i) the Underlying Certificates and all distributions thereon after the Closing Date, (ii) the Note Account (as defined in the Fiscal Agency Agreement), (iii) the right of the Issuer to enforce remedies against the Administrator under the Administration Agreement, (iv) all present and future claims, demands, causes and choses in action in respect of the foregoing and (v) all proceeds of the foregoing of every kind and nature whatsoever, including, without limitation, all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property that at any time constitute all or part of or are included in the proceeds of the foregoing.

"Trust Indenture Act" means the Trust Indenture Act of 1939, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Underlying Certificates" has the meaning given such term in the recitals hereof.

"Underlying Mortgage Loan" has the meaning given such term in the recitals hereof.

5

"Underlying Mortgage Pool" has the meaning given such term in the recitals hereof.

"Underlying Pooling and Servicing Agreements" has the meaning given such term in the recitals hereof.

**Section 1.02.**    *Other Definitional Provisions.*    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Insurance Agreement shall refer to this Insurance Agreement as a whole and not to any particular provision of this Insurance Agreement, and Section, subsection, Schedule and Exhibit references are to this Insurance Agreement unless otherwise specified.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 2.01.**    *Representations and Warranties of EMC, the Seller and the Issuer.* Each of EMC, the Seller and the Issuer, in each case with respect to itself only and not as to any other, represents and warrants as of the Closing Date, as follows:

(a)    *Due Organization and Qualification.*    EMC is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Seller is a Delaware corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Issuer is an exempted company with limited liability incorporated under the laws of the Cayman Islands.  Each of EMC, the Seller and the Issuer is, or shall become, duly qualified to do business, is, or shall be, in good standing and has obtained, or shall obtain, all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Document and the performance of its obligations under the Operative Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Operative Document unenforceable in any respect or would have a material adverse effect upon the Transaction.

(b)    *Power and Authority.*    Each of EMC, the Seller and the Issuer has all necessary power and authority to conduct its business as currently conducted and as described in the Offering Document, to execute, deliver and perform its obligations under the Operative Documents to which it is a party and to consummate the Transaction.

(c)    *Due Authorization.*    The execution, delivery and performance of the Operative Documents by each of EMC, the Seller and the Issuer has been duly authorized by all necessary action and does not require any additional approvals or consents, or other action by or any notice to or filing with any Person, including any governmental entity or any of the stockholders or beneficial owners, as applicable, of EMC, the Seller or the Issuer, which have not previously been obtained or given by EMC, the Seller or the Issuer.

(d)    *Noncontravention.*    The execution and delivery by each of EMC, the Seller or the Issuer of the Operative Documents to which it is a party, the consummation of the

6

Transaction and the satisfaction of the terms and conditions of the Operative Documents do not and will not:

(i)    conflict with or result in any breach or violation of any provision of the applicable organizational documents of EMC, the Seller or the Issuer or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to EMC, the Seller or the Issuer or or any of their respective material properties, including regulations issued by any administrative agency or other governmental authority having supervisory powers over EMC, the Seller or the Issuer, which conflict, breach or violation reasonably could be expected to result in a Material Adverse Change;

(ii)    constitute a default by EMC, the Seller or the Issuer under, result in the acceleration of any obligation under, or breach any provision of any loan agreement, mortgage, indenture or other agreement or instrument to which EMC, the Seller or the Issuer is a party or by which any of their respective properties is or may be bound or affected, which default, acceleration or breach reasonably could result in a Material Adverse Change; or

(iii)except as prov    ided in the Operative Documents, result in or require the creation of any lien upon or in respect of any assets of EMC, the Seller or the Issuer, which lien could reasonably be expected to result in a Material Adverse Change.

(e)    *Legal Proceedings.*  There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting EMC, the Seller or the Issuer or any of their respective subsidiaries, any properties or rights of EMC, the Seller or the Issuer or any of their respective subsidiaries or any of the Underlying Certificates pending or, to EMC's, the Seller's or the Issuer's knowledge after reasonable inquiry, threatened, which, in any case, if decided adversely to EMC, the Seller or the Issuer or any such subsidiary could result in a Material Adverse Change with respect to EMC, the Seller or the Issuer.

(f)    *No Default.*  Neither EMC, the Seller nor the Issuer is in default under or with respect to any of its contractual obligations in any respect which could have a material adverse effect on the rights, interests or remedies of the Insurer hereunder or under the other Operative Documents or on its ability to perform its obligations hereunder or under the other Operative Documents to which it is a party.  No Default or Event of Default with respect to it has occurred and is continuing.

(g)    *Valid and Binding Obligations.*  The Operative Documents (other than the Notes), when executed and delivered by EMC, the Seller or the Issuer, will constitute the legal, valid and binding obligations of each of EMC,  the Seller and the Issuer, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws.  The Issuer represents that the Notes, when executed, authenticated and delivered in accordance with the Fiscal Agency Agreement,

7

will be validly issued and outstanding and entitled to the benefits of the Fiscal Agency Agreement. Each of EMC, the Seller and the Issuer will not at any time in the future deny that the Operative Documents to which it is a party constitute the legal, valid and binding obligations of EMC, the Seller and the Issuer, as applicable.

(h)    *Financial Statements.* The Financial Statements of EMC and of the Seller, copies of which have been furnished to the Insurer, (i) are, as of the dates and for the periods referred to therein, complete and correct in all material respects, (ii) present fairly the financial condition and results of operations of EMC and of the Seller as of the dates and for the periods indicated and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied, except as noted therein (subject as to interim statements to normal year-end adjustments). Since the date of the most recent Financial Statements, there has been no Material Adverse Change in respect of EMC or the Seller. Except as disclosed in the Financial Statements, none of EMC, the Seller or the Issuer is subject to any contingent liabilities or commitments that, individually or in the aggregate, have a material possibility of causing a Material Adverse Change in respect of EMC, the Seller or the Issuer.

(i)    *Compliance with Law, etc.* No practice, procedure or policy employed or proposed to be employed by EMC, the Seller or the Issuer in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to it which, if enforced, could reasonably be expected to result in a Material Adverse Change with respect to it or have a material adverse effect on the Transaction.

(j)    *Good Title; Absence of Liens or Security Interest.* The Issuer is the owner of, and has good and marketable title to, all of the Underlying Certificates free and clear of all liens and has full right, power and lawful authority to assign, transfer and pledge the Underlying Certificates (and any documents which are a part thereof) and all such substitutions therefor and additions thereto delivered under the Fiscal Agency Agreement.

(k)    *Taxes.* Each of EMC, the Seller and the Issuer has filed (or caused to be filed) prior to the date hereof all federal and state tax returns that are required to be filed and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due, except with respect to any failures to file or pay that, individually or in the aggregate, would not result in a Material Adverse Change with respect to EMC, the Seller or the Issuer. Any taxes, fees and other governmental charges payable by EMC, the Seller or the Issuer in connection with the Transaction, the execution and delivery of the Operative Documents and the issuance of the Notes have been paid or shall have been paid at or prior to the Closing Date if such taxes, fees or other governmental charges were due on or prior to the Closing Date.

(l)    *Accuracy of Information.* Neither the Operative Documents nor other material information relating to the Underlying Certificates, the Underlying Mortgage Loans, the operations of EMC, the Seller or the Issuer or the financial condition of EMC, the Seller or the Issuer (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic form by EMC, the Seller or the Issuer contains any statement of a material fact which was untrue or misleading in any material respect when made. Each of EMC, the Seller and the Issuer has no knowledge of any circumstances that could

8

reasonably be expected to cause a Material Adverse Change with respect to EMC, the Seller or the Issuer.  Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to EMC, the Seller or the Issuer that would render any of the Documents untrue or misleading in any material respect.  Without limiting the generality of the foregoing, EMC represents that the information in the Data Tape with respect to each Underlying Mortgage Loan is true and correct as of the Closing Date.

(m)     *Compliance With Securities Laws.*  Assuming the Initial Purchaser's compliance with its obligations pursuant to the Note Purchase Agreement, the offer of the Notes complies or shall comply in all material respects with all requirements of law.  Without limiting the foregoing, the Offering Document does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; *provided, however,* that no representation is made with respect to the information in the Offering Document regarding the Insurer set forth under the captions "Description of the Insurer" and "The Policy" or the financial statements of the Insurer as referred to in the Offering Document or the Initial Purchaser Information.

(n)     *Operative Documents.*  Each of the representations and warranties of EMC, the Seller and the Issuer contained in the applicable Operative Documents is true and correct in all material respects and each of EMC, the Seller and the Issuer hereby makes each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein.  Each of EMC, the Seller and the Issuer will not at any time in the future deny that the Operative Documents to which it is a party constitute the legal, valid and binding obligations of EMC, the Seller and the Issuer, as applicable.

(o)     *Solvency; Fraudulent Conveyance.*  Each of EMC, the Seller and the Issuer is solvent and shall not be rendered insolvent by the Transaction and, after giving effect to the Transaction, EMC, the Seller and the Issuer shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business, and each of EMC, the Seller and the Issuer does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature.  Each of EMC, the Seller and the Issuer does not contemplate the commencement of insolvency, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of EMC, the Seller and the Issuer or any of their respective assets.  The amount of consideration being received by the Seller upon the transfer of the Underlying Certificates to the Issuer constitutes reasonably equivalent value and fair consideration for the Underlying Certificates.  The amount of consideration being received by the Issuer upon the sale of the Notes constitutes reasonably equivalent value and fair consideration for the ownership and/or debt interest evidenced by the Notes.  The Seller is not transferring the Underlying Certificates to the Issuer nor is the Issuer selling or depositing the Notes, as provided in the Operative Documents, with any intent to hinder, delay or defraud any of the Seller's or the Issuer's creditors.

(p)     *Security Interest in the Underlying Certificates.*  On the Closing Date the Issuer will be the sole owner of the Underlying Certificates, the Issuer will have good and marketable title to the Underlying Certificates and will have a first priority perfected security

9

interest in the Underlying Certificates to the extent the intended sale is recharacterized as a pledge to secure financing.

**Section 2.02.** *Affirmative Covenants of EMC, the Seller and the Issuer.* Each of EMC, the Seller and the Issuer, with respect to itself only and not as to any other, hereby agrees that during the term of this Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a)    *Compliance With Agreements and Applicable Laws.* Each of EMC, the Seller and the Issuer shall comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party in all cases in which failure to so comply or perform would result in a default thereunder and shall comply with all requirements of any law, rule or regulation applicable to it in all circumstances where non-compliance reasonably could be expected to result in a Material Adverse Change.

(b)    *Corporate Existence.* Each of EMC, the Seller and the Issuer and their respective successors and permitted assigns shall maintain its corporate existence and shall at all times continue to be duly organized under the laws of their formation and duly qualified and duly authorized (as described in subsections 2.01(a), (b) and (c) hereof) and shall conduct its business in accordance with the terms of its applicable organizational documents.

(c)    *Financial Statements; Accountants' Reports; Other Information.* Each of EMC, the Seller and the Issuer shall keep or cause to be kept in reasonable detail books and records of account of its assets and business relating to the Transaction, and shall, as applicable, clearly reflect therein the sale of the Underlying Certificates to the Issuer and a sale of the equity interest in the Issuer to the Holders of the Notes. EMC shall furnish or cause to be furnished to the Insurer:

(i)    *Annual Financial Statements of each of EMC and the Seller.* As soon as available, and in any event within 120 days after the close of each fiscal year of each of EMC and the Seller, the audited consolidated statement of financial condition of each of EMC and the Seller and their respective subsidiaries as of the end of such fiscal year and the related audited consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, all in reasonable detail, prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by the audit opinion of each of EMC's and the Seller's independent accountants (which shall be a nationally recognized independent public accounting firm or otherwise acceptable to the Insurer).

(ii)    *Quarterly Financial Statements.* Immediately following the earlier to occur of (i) a Material Adverse Change of EMC or the Seller of which an authorized officer of EMC or the Seller, as applicable, has actual knowledge or (ii) upon the request of the Insurer following any Material Adverse Change of EMC or the Seller, but in any event within 45 days after the occurrence of, or knowledge of, such Material Adverse Change, the unaudited consolidated statement of financial condition of EMC or the Seller, as applicable, and their respective subsidiaries as of the end of the first three quarters of each fiscal year of each of EMC and the Seller and the related unaudited

10

consolidated statements of operations, stockholders' equity and cash flows for the portion of the fiscal year then ended, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments); each delivery of quarterly financial statements shall be accompanied by a certificate of one (or more) corporate officers stating that the quarterly financial statements are correct in all material respects and present fairly the financial condition and results of operations of each of EMC and the Seller and their respective subsidiaries as of the dates and for the periods indicated, in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments).    Promptly following the delivery of these quarterly financial statements, EMC and the Seller shall cause their respective Chief Financial Officers or Treasurers (or other responsible officer, provided that each of EMC and the Seller shall cause their Chief Financial Officers or Treasurers to be available if such other officer is unable to answer the Insurer's questions to the Insurer's satisfaction) to be available for a conference call with the Insurer, during normal business hours and upon reasonable prior request from the Insurer.

(iii) *Under lying Mortgage Loan Data.* (A) On or before the Closing Date, EMC will provide a copy of a magnetic tape (the "Data Tape") setting forth, as to each Underlying Mortgage Loan, the information required under the definition of "Mortgage Loan Schedule" in each related Underlying Pooling and Servicing Agreement and information for each Underlying Mortgage Loan for each of the following data fields:

- FICO score
- documentation type
- pay history
- LTV and CLTV
- loan purpose
- zip code
- seller/originator; and

(B)    on each Payment Date, EMC will provide to the Insurer (i) the complete servicing tape for the Underlying Mortgage Loans with respect to such Payment Date, including updated Underlying Mortgage Loan data, including changes to information discovered to have been incorrect, and including codes indicating the delinquency status of each Underlying Mortgage Loan (*e.g.*, less than 30 days delinquent, 30-59 days delinquent, 60-89 days delinquent, 90+ days delinquent) and identifying Underlying Mortgage Loan's that are in foreclosure, Underlying Mortgage Loan's for which the mortgagor is the subject of a bankruptcy or other insolvency proceeding, and Underlying Mortgage Loan's that have been converted into real estate owned ("REO"), (ii) a report identifying any Underlying Mortgage Loan's that were modified, waived or amended during the prior calendar month, (iii) aggregate cumulative realized losses incurred on the Underlying Mortgage Loans from each Underlying Mortgage Pool and

11

from all Underlying Mortgage Pools in the aggregate and (iv) any other information reasonably requested by the Insurer.

(iv)    *Other Information.*  (A) Promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by EMC, the Seller or the Issuer pursuant to the terms of any of the Operative Documents, including all reports provided to the Fiscal Agent, the Collateral Agent or any Noteholder pursuant to the Fiscal Agency Agreement, (B) promptly upon request, such other data as the Insurer may reasonably request and (C) all information required to be furnished to the Fiscal Agent, the Collateral Agent or the Noteholders simultaneously with the furnishing thereof to the Fiscal Agent, the Collateral Agent or the Noteholders, as the case may be.

All financial statements specified in clauses (i) and (ii) of this subsection (c) shall be furnished in consolidated form for each of EMC and the Seller and all of their respective subsidiaries in the event that each of EMC and the Seller shall consolidate its financial statements with its subsidiaries.

The information supplied pursuant to clauses (iii) and (iv) above will be in Excel or Word format or another form of an electronic data file accessible by the Insurer by means of standard application software; *provided, however,* that the information required to be furnished pursuant to Section 2.02(d)(iii)(B) may be made available on EMC's internet website.

(d)    *Access to Records; Discussions with Officers and Accountants.*  Once in each calendar year, or at any time following any withdrawal, reduction or qualification of any rating assigned to any of the Underlying Certificates (a "Ratings Event"), following the occurrence of any Default or Event of Default that has not been waived or cured, at any time following the occurrence of a Trigger Event, or, with respect to EMC, an Event of Servicer Termination has occurred the Seller and EMC shall, upon the reasonable request of the Insurer, permit the Insurer or its authorized agents:

(i)    to inspect the books and records of the Seller and EMC as they may relate to the Underlying Mortgage Loans or Underlying Certificates, the Notes, the obligations of the Seller or EMC under the Operative Documents to which it is a party and the Transaction;

(ii)    to discuss the affairs, finances and accounts of the Seller and EMC as they relate to the Underlying Mortgage Loans or Underlying Certificates, the Transaction or the Seller's or EMC's ability to perform its respective obligations under the Operative Documents with an officer of the Seller or EMC, as applicable; and

(iii)if    the Insurer reasonably believes that a Material Adverse Change may have occurred and with the Seller's or EMC's consent, as applicable, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of the Seller or EMC with such party's independent accountants; *provided, however,* that an officer of the Seller or EMC, as applicable, shall have the right to be present during such discussions.

Such inspections and discussions shall be conducted during normal business hours and shall not unreasonably disrupt the business of the Seller or EMC. The books and records of the Seller and EMC shall be maintained at the address of the Seller or EMC, as applicable, designated herein for receipt of notices, unless the Seller or EMC, as applicable, shall otherwise advise the parties hereto in writing.

Notwithstanding the foregoing, the Insurer shall have the right, so long as any of the Notes remains outstanding, to conduct an ongoing review of EMC's practices as a servicer and master servicer through reviews of the Underlying Mortgage Loans, reappraisals of mortgaged properties related to such Underlying Mortgage Loans and reviews of servicing practices.

All of the inspections, discussions and due diligence referred to in this Section 2.02(d) shall be at the expense of the Insurer; *provided, however*, that any such undertaking following a Ratings Event, a Trigger Event or the occurrence of a Default, Event of Default or Event of Servicer Termination that remains uncured and unwaived, shall be at the expense of EMC.

(e)    *Notice of Material Events*. Each of the Seller, the Issuer and EMC shall be obligated, each with respect to itself only and not as to any other (which obligation shall be satisfied as to each of the Seller and the Issuer if performed by the Seller or the Issuer) promptly to inform the Insurer in writing of the occurrence of any of the following:

(i)    the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation, or rule making or disciplinary proceeding by or against it that (A) would be required to be disclosed to the Commission or its shareholders that relates to the Underlying Mortgage Loans, the Transaction or its ability to perform its obligations under the Operative Documents or (B) could result in a Material Adverse Change with respect to it or a material adverse effect on the Transaction, or to the best of the knowledge of the Seller, the Issuer or EMC, the initiation of any proceeding or the promulgation of any proceeding or any proposed or final rule which would likely result in a Material Adverse Change with respect to it or a material adverse effect on the Transaction;

(ii)    any change in the location of the principal office or jurisdiction of formation of it;

(iii)    the occurrence of any Default or Event of Default or any Material Adverse Change in respect of it;

(iv)    the commencement of any proceedings by or against it under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for it or any of its respective assets; or

(v)    the receipt of notice that (A) it is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval necessary for the conduct of it's business is to be, or may be, suspended or revoked or (C) it is to cease and desist any practice, procedure or policy employed by it in the conduct of its respective

business, and such suspension, revocation or cessation may reasonably be expected to result in a Material Adverse Change with respect to it or a material adverse effect on the Transaction.

(f)     *Financing Statements and Further Assurances.*  The Seller shall cause to be filed all necessary financing statements or other instruments, and any amendments or continuation statements relating thereto, necessary to be kept and filed in such manner and in such places as may be required by law to preserve and protect fully the interest of the Issuer in the Underlying Certificates.  Each of the Seller, the Issuer and EMC shall, upon the reasonable request of the Insurer, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within ten days of such request, such amendments hereto and such further instruments and take such further action as may be reasonably necessary to effectuate the intention, performance and provisions of the Operative Documents.

(g)     *Maintenance of Licenses.*  Each of the Seller, the Issuer and EMC, and any successors thereof, shall maintain all licenses, permits, charters and registrations the loss or suspension of which could result in a Material Adverse Change.

(h)     *Retirement of Insured Notes.*  The Issuer shall instruct the Collateral Agent, upon a retirement or other payment of the Insured Notes, to surrender the Policy to the Insurer for cancellation.

(i)     *Disclosure Document.*  It will not use, or distribute to any Person for use, any information relating to the Insurer unless such information has been furnished by the Insurer and the use or distribution of such information has been approved by the Insurer in writing.  The Insurer hereby consents to the inclusion of the information in respect of the Insurer included as of the date hereof in the Offering Document.  Any Offering Document delivered with respect to the Notes shall clearly disclose that the Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

(j)     *Third-Party Beneficiary.*  Each of the Seller, the Issuer and EMC agrees that the Insurer shall have all rights provided to the Insurer in the Operative Documents and that the Insurer shall constitute a third-party beneficiary with respect to such rights in respect of the Operative Documents and hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer.  The Insurer agrees that the rights it shall have as a third-party beneficiary under the Fiscal Agency Agreement shall be limited to the rights granted to it and to the Noteholders in the Fiscal Agency Agreement.

(k)     *Corporate Formalities.*  Each of the Seller, the Issuer and EMC shall observe all the formalities necessary to preserve its corporate or trust existence, as applicable, under the laws of the State of its formation, including, as applicable, (i) the obligation to hold annual meetings of its beneficial owners, shareholders or its board of directors and (ii) the obligation to prepare and file annual income, franchise and other tax returns.

(l)     *Closing Documents.*  The Issuer shall provide or cause to be provided to the Insurer an executed original copy of each document executed in connection with the Transaction within 30 days after the Closing Date.

14

(m)    *Incorporation of Covenants.*  Each of the Seller, the Issuer and EMC agree to comply with its respective covenants set forth in the Operative Documents and hereby incorporate such covenants by reference as if each were set forth herein.

(n)    *Servicing of Mortgage Loans.*  EMC will service the Underlying Mortgage Loans in compliance with the terms of the related Underlying Pooling and Servicing Agreement.

**Section 2.03.**    *Negative Covenants of the Seller, the Issuer and EMC.*  Each of the Seller, the Issuer and EMC hereby agrees, with respect to itself only, and not as to any other, that during the term of this Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a)    *Impairment of Rights.*  None of the Seller, the Issuer and EMC shall take any action, or fail to take any action, if such action or failure to take action may result in a Material Adverse Change with respect to the Seller, the Issuer and EMC, nor interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Operative Documents or the Policy.  The Seller, the Issuer and EMC shall give the Insurer written notice of any such action or, to the best of the knowledge of any of the Seller, the Issuer and EMC, any such failure to act on the earlier of: (i) the date upon which any publicly available filing or release is made with respect to such action or failure to act and (ii) promptly prior to the date of consummation of such action or failure to act.  Each of the Seller, the Issuer and EMC shall furnish to the Insurer all information reasonably requested by the Insurer that is necessary to determine compliance with this paragraph.

(b)    *Waiver, Amendments, Etc.*  None of the Seller, the Issuer and EMC shall modify, waive or amend, or consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of the Operative Documents to which it is a party (other than any amendment to the Offering Document required by law) without the prior written consent of the Insurer thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    *Limitation on Mergers, Etc.*  None of the Issuer and EMC shall consolidate with or merge with or into any Person or transfer all or substantially all of its assets to any Person or liquidate or dissolve except as provided in the Operative Documents or as permitted hereby.  Each of the Issuer and EMC shall furnish to the Insurer all information requested by the Insurer that is reasonably necessary to determine compliance with this paragraph.

(d)    *Successors.*  None of the Seller or Issuer shall terminate or designate, or consent to the termination or designation of, any successor Fiscal Agent or Collateral Agent without the prior written approval of the Insurer.

(e)    *Bankruptcy Remoteness of the Issuer.*  The Issuer shall not fail to maintain its status as a bankruptcy remote entity.

(f)    *Exercising Clean-up Call.*  Neither EMC nor the Seller shall exercise their respective Clean-up Call rights to exercise such rights in the Underlying Pooling and Servicing Agreements without the prior written consent of the Insurer if such redemption would result in a

15

shortfall on the unpaid principal balance and accrued interest owed on an Underlying Certificate, a draw on the Policy or would leave the Insurer unreimbursed for Reimbursement Amounts.

Section 2.04.    *[RESERVED]*.

Section 2.05.    *Representations, Warranties and Covenants of the Insurer*.  The Insurer represents and warrants as of the Closing Date, and, in the case of Section 2.05(g) below, covenants during the term of this Insurance Agreement, to the Initial Purchaser, the Issuer, EMC and the Seller as follows:

(a)    *Organization and Licensing*.  The Insurer is a duly incorporated and existing New York stock insurance company licensed to do business in the State of New York and is in good standing under the laws of such state.

(b)    *Corporate Power*.  The Insurer has the corporate power and authority to issue the Policy, execute and deliver this Insurance Agreement and perform all of its obligations hereunder and thereunder.

(c)    *Authorization; Approvals; No Conflicts*.  The issuance of the Policy and the execution, delivery and performance of this Insurance Agreement have been duly authorized by all necessary corporate proceedings and will not result in any violation of (i) any law, regulation, rule or order applicable to the Insurer, (ii) the Insurer's organizational documents or (iii) any material indenture, contract or other agreement to which the Insurer is a party.  No further approvals or filings of any kind, including, without limitation, any further approvals of or further filings with any governmental agency or other governmental authority, or any approval of the Insurer's board of directors or stockholders, are necessary for the Policy and this Insurance Agreement to constitute the legal, valid and binding obligations of the Insurer.

(d)    *Enforceability*.  The Policy, when issued, and this Insurance Agreement will each constitute a legal, valid and binding obligation of the Insurer, enforceable in accordance with its terms, subject to applicable laws affecting the enforcement of creditors' rights generally.

(e)    *Insurer Information*.  As of the date of the Offering Document and as of the Closing Date, the Insurer Information does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(f)    *No Litigation*.  There are no actions, suits, proceedings or investigations pending or, to the best of the Insurer's knowledge, threatened against it at law or in equity or before or by any court, governmental agency, board or commission or any arbitrator which should reasonably be expected to materially and adversely affect its ability to perform its obligations under the Policy or this Insurance Agreement.

(g)    *Confidential Information*.  The Insurer agrees that it and its shareholders, directors, agents, accountants and attorneys shall keep confidential any information provided to the Insurer pursuant to or in connection with this Insurance Agreement or the issuance of the Policy or otherwise related to the Transaction, including any matter of which it becomes aware

16

during the inspections conducted or discussions had pursuant to Section 2.02(d), unless such information is readily available from public sources or except as may be otherwise required by regulation, law or court order or requested by appropriate governmental authorities or as necessary to preserve its rights or security under or to enforce the Operative Documents or the Policy; *provided, however,* that the foregoing shall not limit the right of the Insurer to make such information available to its regulators, securities rating agencies, reinsurers, credit and liquidity providers, counsel and accountants.  If the Insurer is requested or required (by oral questions, interrogatories, requests for information or documents subpoena, civil investigative demand or similar process) to disclose information provided to the Insurer pursuant to or in connection with this Insurance Agreement or the issuance of the Policy or otherwise related to the Transaction, including any information of which it becomes aware through such inspections or discussions, the Insurer will, to the extent legally permissible, promptly notify the Seller or EMC, as applicable, of such request(s) so that the Seller or EMC, as applicable, may seek, at its own expense, an appropriate protective order and/or waive the Insurer's compliance with the provisions of this Insurance Agreement.  If, in the absence of a protective order or the receipt of a waiver hereunder, the Insurer is, nonetheless, in the opinion of its counsel, compelled to disclose such information to any tribunal or else stand liable for contempt or suffer other censure or significant penalty, the Insurer may disclose such information to such tribunal that the Insurer is compelled to disclose; *provided, however,* that a copy of all information disclosed, to the extent legally permissible, is provided to the Seller or EMC, as applicable, promptly upon such disclosure.

## ARTICLE III
## THE POLICY; REIMBURSEMENT

**Section 3.01.**    *Issuance of the Policy.*  The Insurer agrees to issue the Policy on the Closing Date subject to satisfaction of the conditions precedent set forth below on or prior to the Closing Date:

(a)    *Payment of Premium and Expenses; Premium Letter.*  The Insurer shall have been paid a nonrefundable upfront payment of the Premium, specified in the Premium Letter and shall have been reimbursed for other fees and expenses identified in the Premium Letter or in Section 3.02 below as payable at closing, unless otherwise agreed to in writing between the Issuer and the Insurer;

(b)    *Operative Documents.*  The Insurer shall have received a copy of each of the Operative Documents, in form and substance reasonably satisfactory to the Insurer, duly authorized, executed and delivered by each party thereto;

(c)    *Representations and Warranties.*  The representations and warranties of the Seller, the Issuer and EMC dated the Closing Date set forth or incorporated by reference in this Insurance Agreement shall be true and correct on and as of the Closing Date as if made on the Closing Date;

(d)    *Opinions of Counsel.*  The Insurer shall have received all opinions in form and substance reasonably satisfactory to the Insurer, addressed to the Insurer and addressing such

17

matters as the Insurer may reasonably request, and the counsel providing each such opinion shall have been instructed by its client to deliver such opinion to the addressees thereof;

(e)     *No Litigation, Etc.*  No suit, action or other proceeding, investigation or injunction, or final judgment relating thereto, shall be pending or threatened before any court, governmental or administrative agency or arbitrator in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with any of the Operative Documents or the consummation of the Transaction;

(f)     *Legality.*  No statute, rule, regulation or order shall have been enacted, entered or deemed applicable by any government or governmental or administrative agency or court that would make the Transaction illegal or otherwise prevent the consummation thereof;

(g)     *Satisfaction of Conditions of the Note Purchase Agreement.*  All conditions in the Note Purchase Agreement relating to the Initial Purchaser's obligation, if any, to purchase the Offered Notes shall have been satisfied, without taking into account any waiver by the Initial Purchaser of any condition unless such waiver has been approved by the Insurer. The Insurer shall have received copies of each of the documents, and shall be entitled to rely on each of the documents, required to be delivered to the Initial Purchaser pursuant to the Note Purchase Agreement;

(h)     [*RESERVED*];

(i)     *No Default.*  No Default or Event of Default shall have occurred;

(j)     *Satisfactory Documentation.*  The Insurer and its counsel shall have reasonably determined that all documents, certificates and opinions to be delivered in connection with the Notes conform to the terms of the Fiscal Agency Agreement, the Asset Sale Agreement, the Offering Document and this Insurance Agreement; and

(k)     *Delivery of Underlying Certificates.*  The Insurer shall have received evidence satisfactory to it that delivery of the Underlying Certificates has been made to the Collateral Agent pursuant to Section 6 of the Fiscal Agency Agreement.

**Section 3.02.**     *Payment of Fees and Premium.*

(a)     *Legal Fees.*  The Issuer shall pay or cause to be paid to the Insurer, at the Closing Date, legal fees incurred by the Insurer in connection with the issuance of the Policy amounts and as described in the Premium Letter.

(b)     *Premium.*  In consideration of the issuance by the Insurer of the Policy, the Insurer shall be paid the Premium in the Premium Amount, on the Closing Date, in accordance with the terms of the Premium Letter and Section 40(f) of the Fiscal Agency Agreement. The Premium Amount paid hereunder and pursuant to the Operative Documents and the Premium Letter shall be nonrefundable without regard to whether the Insurer makes any payment under the Policy or any other circumstances relating to the Insured Notes or provision being made for payment of the Insured Notes prior to maturity. Payment of the Premium Amount shall be made by wire transfer to the account designated by the Insurer by written notice to the Issuer. The

18